All right, Ms. Wanamaker, whenever you're ready. Thank you, Your Honor. May it please the court. I'm Katherine Wanamaker for Appellant Conservation Groups. This case concerns the Kane Hoy development just outside of Charleston, South Carolina. The Kane Hoy development is not your average new residential development. Rather, it is the creation of a new small city sprawling across 9,000 acres of wetlands and pristine forest habitat bordering a national forest. To transform Kane Hoy into this new city, the developers needed permits under both the National Environmental Policy Act, the Endangered Species Act, and the Clean Water Act. The government's approvals under each of these statutes are fatally flawed. Most glaringly, the Endangered Species Act approval at issue here, the biological opinion issued by the Fish and Wildlife Service, suffers from the exact same flaws as the biological opinion rejected by this court in the Sierra Club case that is cited throughout our briefs in great detail. The biological opinion here, as the biological opinion did in that case, provides an unlimited license to take, which is a term of art under the Endangered Species Act, which essentially means to kill or harm all of the northern long-eared bats on the property. Any questions? The Supreme Court seemed to look at that in some depth and distinguish this case from the Sierra Club case. If I'm remembering correctly, the issue there was there was a very small parcel of land, less than half an acre, next to a hibernating site, and the biological opinion said that the justified take would be a small percentage, which, of course, nobody knows what a small has ever seen one of these bats in this project area. And the adjoining quarter million acres of national forests, they had seen one or two some number of years ago. So it seems like to me the factual setting is significantly different here than it was in the Sierra Club case. Your Honor, this is a central flaw in the District Court's opinion, and I'd be happy to address it. This case is no different than Sierra Club in terms of the presence of the species near the project area. And in fact, that issue has been decided. The District Court committed clear error in holding that. So why do you say that? I mean, if I remember in Sierra Club correctly, you had lots of bats in that general area, and lots of them in caves near there. They were native to that area, not native here. Why was the District Court wrong? You seem to say Sierra Club provides that there has to be a numerical take set every time, and that's just not what the case law says. It says you must set, Sierra Club says you must set, and the Endangered Species Act and its regulations say, you must set a numeric take limit unless it is truly impractical. And that's what the service found here, that the bats cannot be practically monitored. Did you dispute that in your briefing? I didn't see it. Yes, Your Honor, we did. So how could the take be monitored then? The take can be monitored here in the same way that the take can be monitored in Sierra Club. I mean, it's the exact same type of... Here, I mean, as Judge Agee set out, the facts here are different than in Sierra Club. Here, these bats have not been seen, and only a couple of them several years ago in the adjoining forest, which is different from Sierra Club. Well, Your Honor, I don't think that's correct with all due respect, because in Sierra Club, it involved bats. It involved the northern wanger bat, it involved the Just because both things involved bats doesn't make them similar in the respective practical monitoring ability. But if I may finish, there were multiple species that issued in Sierra Club. There were bats, there was the club shell, and there was a bumblebee. And for all of those species, the service basically said, especially for the bumblebee and for the club shell and for the log part, where it set a numeric limit, we have not observed many of these species. Only a few have been found in adjacent areas. Yet, you know, we cannot set a numeric take limit because we don't have local population data. And the court struck that down and said, yes, in fact, you can set a numeric limit because you can survey for these species. And that's the same, it's exactly the same. Were you able to, I don't know if you finished answering about how the take could be monitored here. Well, the service says it's not practical, how could it be done? Again, Your Honor, that argument was raised in the Sierra Club case, and it was rejected by this court. I mean, they said... These are factual determinations that are made case by case. You seem to imply there's some national rule, and there are lots of cases where some non-numerical take has been approved. If I may just address the monitoring point. In the Sierra Club case, the service took the exact same position that it's taking here, which is we cannot monitor bat take because it will be difficult to detect dead or impaired bats. That's exactly what they said. And the court rejected that and said, no, you can. You can survey for the bats. You've done it before, and it cited multiple biological opinions. I thought there was a survey here, and they couldn't find it, and the district court offered you the opportunity to do your own survey, and you turned it down. Your Honor, it's not our burden under the Endangered Species Act to go survey private property to find the presence of a... Well, but it is your burden to put on some evidence. Did you put on any type of scientific expert evidence here? This is an administrative record review case, Your Honor. The presence of bats, this is what happened, and this is why I say the issue has been decided. The Fish and Wildlife Service asked the developers to survey the site. The agreed instead to assume presence of the bats. The service found bats are likely on the parcel, and now in the litigation, once we've gotten to litigation, the developers have come in and said, oh, never mind, there are no bats on the site. I thought they did survey a part of it. They surveyed, the only survey in the administrative record is 170 acres, and what the service makes clear in the They surveyed 1,500 acres. They surveyed 170 acres and submitted that to the service for approval, and that is the only survey in the record. They have since surveyed some extra parcels, but we know nothing about those. We don't know whether they complied with the survey protocols of the service, if they were done at the right time of year. The service does not accept, as I understand it, those surveys as proof of absence of the bat, and in fact, the biological opinion finds that the bats are likely on the parcel. So all of this notion that there are no bats on the parcel is just, has been invented in the litigation, and you know, moreover, Your Honor, I think just to be clear, if that's what they said, was that they can't be practically monitored. And they said that, Your Honor, in Sierra Club, for the same exact reasons, and the court rejected that, and said, you can't, they can be monitored. And the George Washington Biological Opinion cited in that opinion, and the Enbridge. But then that goes back to the, what Judge Agee was saying about, it's a case-by-case sort of analysis based on the facts of each individual case, as to whether or not the particular species could be practically monitored in that instance. And in this instance, the service has found that they cannot be practically monitored, and the District Court apparently agreed. But that, I mean, Your Honor, that is the height of arbitrary. It's the exact same type of clearing, and a bat, that was at issue in Sierra Club. Can I ask you a different, sort of a different route? Yes, Your Honor, sure. What is the imminent, likelihood of imminent harm to appellants? Well, Your Honor, since the Endangered Species Act approval came out in July, the developers have been out at the site clearing as much land as possible from July until now. And that is, you're getting to the heart of the issue here. All we're asking for is a temporary pause until we can get to the merits of this case. We're asking for an injunction only to get to the merits, so that this can be resolved on the merits before more habitat is lost at the site. While there are still available alternatives under NEPA, should the court find that an EIS is required, if the clearing continues for the next months or a year before we get to summary judgment, you know, our remedies are far more limited. So that is the imminent harm. I think the case law is very clear that when an endangered species is at issue, as it unquestionably is here. I mean, we wouldn't be here if there were not likely take of bats. That's the whole reason we have this biological opinion. So what's the evidence of a likelihood of the taking of bats? I mean, other than the presumption, which I think the developer did just because they've been at it for so many years, and they wanted to move this thing along. I'm just having a lot of trouble finding any evidence in the record that supports your factual representations. I mean, I think, Your Honor, that the evidence of the presence of the bats and the harm to the bats is clear throughout the biological opinion. I would be happy to pull the JA site for you. Just give us a real short summary of what that is. A real short summary. There's a table in the biological opinion. I think it's JA 185. If I'm correct, you can give me the citation, but it has a whole chart that lists all of the harms to bats on this property from the clearing, direct injury or mortality, lethal take in three different ways. I mean, that is clear evidence of harm from the expert agency who is charged to protect the species. I guess, you know, Your Honor, another way to explain this case is if they're going to assume presence of the bats and then say, oh, but there's no problem. They're going to, you know, take all these bats, but there's no problem. We wouldn't be here if they had set a numeric take limit at zero or even one, but instead what they've done is assume the presence of the bats. You would have agreed to a numeric take of zero? Or one? Sure. Yes, absolutely. I mean, it could have been slightly better. There's a table on JA 184 that says summary table of effects, but it also includes the conservation measures that will be undertaken. Yes, I mean, no question. There are some conservation measures, but those do not take away the lethal take authorized by this biop, which is why there must be a lawful incidental take statement here. And, Your Honor, there isn't. It's a carte blanche take all of the bats on the property. If they had set a numeric take limit at zero or one because they didn't really think bats were on the property, that'd be fine. We wouldn't be here, but that's not what they did. What they did is just what they did in Sierra Club, which is allow them to take all of the bats in connection with all of the planned clearing on this site, and that, Your Honor, is unlawful. And it gives rise to irreparable harm to us in addition to a number of other irreparable harms, including the filling of wetlands, traffic, location of housing in the floodplain. And I will just note, as my time is about to expire, that the district court found no countervailing harm to the developers from a temporary pause here, and that's all that we're asking for. All right, you've got some rebuttal time left. So we'll hear now from Mr. McArdle. You represent the Corps of Engineers or the Intervenors? Good morning, Your Honor. Yes, Kevin McArdle for the federal defendants. The district court properly exercised its discretion in denying a preliminary injunction and its decision should be affirmed. I'd like to briefly address irreparable harm, since Ms. Wanamaker addressed that last, and the public interest before moving on and addressing the ESA issue. In terms of irreparable harm, plaintiffs haven't made the requisite showing, and they can't do so now. The district court entered a scheduling order on November 20th. If there's no dispute about the administrative record, the summary judgment briefing will be completed by February 27th. Tree clearings are already prohibited from December 15th to February 15th. It's prohibited again from April 1st to July 1st. So the plaintiffs would have to show that the limited amount of tree clearing that can occur in the interim would irreparably harm their ability to view bats in areas outside the private Cane Point Plantation, like the National Forest. They haven't done that. On page 183 of the joint appendix, the service found that the project as a whole will not have a measurable impact on populations within the East Coast Representation Unit for the bat, which is just one portion of the species. No measurable impact, and that's undisputed. There's no contrary evidence at all. So there is no basis for a finding. What was that JA site? 183, where the court, the service said no measurable impact on populations within the East Coast RPU. Then with respect to the public interest, I think it's important to note this case illustrates how federal regulation works to serve the public interest. The petitioners came in, they said initially they wanted to apply for multiple permits to develop the property, and the court said, hey look, if you apply for one with a master plan development, we can assess the whole thing and make sure that it's adequately protected. And to their credit, the applicants said, okay, we'll do that. It was more expensive and time-consuming for them, but they did it. At the end of the process, they got the permit they needed to construct 9,000 houses that are critically needed in the heart of Charleston's urban growth corridor. At the same time, the court secured the permanent protection of nearly 3,000 acres, or in excess of 3,000 acres. On private property, including the most significant wetlands and uplands that will serve as habitat for protected species, and that provides habitat corridors to the adjacent national forest. So this is a win-win. This shows how federal regulation works, and a preliminary injunction in these circumstances would just serve the public interest. Well, there were, if I'm remembering correctly, a number of proactive things that the developer was to do, put up a back roost, do some other monitoring, and things of that nature. Are those in effect now? The restrictions on the times of year, the time of the year that you can do development activities, is all that currently in place? Yes, there are a series of protective measures that factored into, importantly, factoring into the district court's decision, and rightfully so. So tree clearings prohibited six months out of the year, including during the periods when bats are non-volatile, which means they can't fly. Is that the listing of conservation measures at JA 184? Yes, I think JA 184 includes both the stressors and the required mitigation measures. So in addition to the seasonal restrictions, which, that's important because the risk of fatal harm is greatest when bats can't fly. But outside of those periods, and the service documented this at page 174 of the Joint Appendix, the most likely outcome is that the bat will fly to other habitat in the area, and there will be a considerable amount of habitat remaining in the project area, and also in the adjacent 260,000 acre National Forest. So that's a critically important and useful mitigation measure. But in addition to that, the applicants can't engage, use loud machinery right around sunset and sunrise when the bats may be feeding. They can't use artificial lighting. They have to put up bat boxes. There are a series of measures that are aimed at minimizing the risk of lethal harm and significant harm. So what happens if they do operate during dusk and dawn hours, or they use all this light? What happens? Well, then they're deviating from the required terms and conditions, which can invalidate the incidental take statement and potentially make them liable for take. And it also can trigger, separately, aside from the take limit, can trigger reinitiation of consultation, because it represents a modification of the action that was the subject of consultation. So if you look at the reinitiation regulation, 50 CFR 402.16, there's several different triggers for reinitiation, not just the take limit. And one is modification of the action. And if they're deviating from the required conservation measures, it's a modification of the action. So there would have to be an assessment whether that requires reinitiation. Now, on the use of a surrogate, which is the key issue here, the service reasonably determined that the use of a habitat surrogate satisfies the regulatory criteria. And there's nothing in C.R.A. Club that undermines the agency's expert judgment. As Judge Thacker noted, the key reason documented on page 188 of the Joint Appendix that the service used a surrogate is because you can't practically monitor the take of bats on an ongoing basis. That's the point of the take level in the ITS, to function as a reinitiation trigger. It's not just to gin up a number. It's to come up with a reinitiation trigger that everyone can practically apply, and that everyone knows once it's exceeded, you have to reinitiate. A numeric take estimate here wouldn't serve that purpose, because you can't monitor when a bat flies away to another area and suffers a fitness reduction. And you can't monitor when a bat flies up to 35 miles away. Well, what about opposing counsel very much likens this case to the C.R.A. case where we considered bats there. What's your response to that? She argues it's the exact same thing. It's absolutely not the same. At no point in the opinion did the court say, you can monitor non-lethal take of bats associated with clearing 3,900 acres of property. The court's concern there was, as Judge Agee noted, the service didn't use a true habitat surrogate that could be monitored. It took that amount of habitat, and it either applied an arbitrary multiplier, reducing the amount by 50%, or it said a small percentage of bats will be taken. And nobody knew what that meant, and that can't be monitored like a true habitat surrogate can. So that was the principal problem. Now, the court did go on and said, you know, bats might be small, but you've surveyed for them in the past, and you've issued numeric take estimates for the Indiana bat. So you haven't demonstrated that it would be impractical to calculate a numeric take estimate here. Two responses. That's a distinct issue. Use of a surrogate is appropriate either if you can't provide a numeric take estimate, or if you can't monitor a take. And the court in Sierra Club never went on to reach that second issue, because it didn't have to, because the service didn't use a habitat surrogate in the first place. And I think it's really useful, sort of answers all the issues at once. If you look at the revised biological opinion that the service issued after Sierra Club, which the petitioners referenced, the plaintiffs referenced in their opening brief, you know, it's attached to the petition for review in the Defenders of Wildlife case. And if you pull that up, you'll see, in response to Sierra Club, is that pages 77 through 79 of that amended biological opinion. The service did come up with a numeric take estimate for the northern long-eared bat. But it was based on hibernacular counts, nearby counts at a nearby hibernaculum, and the associated swarming range. Using those two elements, they came up with a numeric take estimate. You can't do that here, because the bat doesn't hibernate in coastal South Carolina. There are no hibernacula. There's no swarming range. Then the service said... Is that in the ITS itself, or is that an argument that's being made on appeal? No, that's in the ITS for the Atlantic Coast Pipeline. The absence of hibernacula is in the ITS itself? Oh, it's in the Environmental Assessment, documented that there are no hibernacula, no caves. And also, in the BIOP, BIOP does document that the best available science suggests that, in this area of coastal South Carolina, bats are active year-round. They don't hibernate. They go into short periods of winter torpor, but they don't hibernate at all. I can try to find a site for that quickly. I understand that that argument is being made on appeal. My understanding from the ITS is that it was never made... That it was never stated as the reason for impracticability in the ITS. Well, the service said, we don't have density estimates, and without those, we can't come up with a numeric take estimate. And the plaintiff said, well, yes, you can. Go take a look at the revised biological opinion for the Atlantic Coast Pipeline. And there, they came up with an estimate, but it was based on a hibernacula count. And so the response to that argument is, you can't do that here, because the bat doesn't hibernate in coastal South Carolina. And that's not post-hoc. It's documented in the biological opinion. And then also, the service noted there that the surveys that the plaintiffs keep demanding are for the purpose of determining presence or absence, which is already assumed here. And it says right at page 325 from note 2 of the joint appendix, those surveys are not robust enough to be used to develop a local population estimate. And also, in the revised biological opinion for the Atlantic Coast Pipeline, the service again said, those surveys can't be used to develop a local population estimate. And in fact, you can't come up with one for a project that's going to be conducted over a multi-year period like this one. And finally, the service, even though it came up with a numeric take estimate, it actually used a habitat surrogate to serve as the reinitiation trigger, precisely because take of bats can't be reliably monitored. So that revised opinion sort of answers all the issues here. And it's entirely consistent with the service's findings in the biological opinion in this case. And the difficulty in monitoring alone is a sufficient basis for using the habitat surrogate under both the regulation and Sierra Club. So that's, I could answer any other questions, but there's no question here that use of the habitat surrogate was lawful. And for that reason, claims are unlikely to succeed on the merits. There are no other questions. The District Court's denial of a preliminary injunction should be affirmed. Thank you very much, Mr. McArdle. Mr. Dehart, you have some time. May it please the Court, Judge Agee, Judge Thacker, Judge Berner, my name is Rhett Dehart. I'm a partner at Womble Bond Dickinson in Charleston, South Carolina, and I represent the defendant intervenors in this action. I wanted to go back to one point that Judge Agee asked Ms. Wanamaker at the outset. In this case, the plaintiffs, as we all know, have a very heavy burden of proof. And there are two passages I wanted to bring the Court's attention to at the injunction hearing in September that shows the defendants, excuse me, that shows that the plaintiffs have not met their burden. I think the Court will find these illuminating. The first passage is on page 39 of the transcript, and it was at the conclusion of the hearing, and the District Court noted, and I'll quote... Do you have a joint appendix cited for that? It's, Your Honor, it's 39 of the transcript hearing. I can send it to you, Your Honor. I don't have a joint. But it is in the appendix somewhere. Yes, sir. The injunction hearing transcript is in the joint appendix, and it's on page 39 of that, and I'll quote directly from it. But it was an interesting point, and it goes back to your first argument, Judge Agee. I don't make an argument. I just ask questions. Yes, sir. Sure helped our argument. Great question. But in any event, the District Court asked Ms. Wanamaker, quote, but you know, I was struck that the only... that I didn't have any scientific support challenging the biological opinion. You know, this issue has been floating around since July of 2023. I've read and reread the biological opinion. Like I said, I've read closer about the bats and woodpeckers, and you know, it's pretty clear this was done deliberately. The second passage from the September hearing has to do with acoustic surveys. As Your Honor knows, my clients assume presence. In addition, we surveyed 1,500 acres pursuant to the Fish and Wildlife Regulations. Not a single long-eared bat was found. And more importantly, in the environmental assessment, and this is at JA 1049, in 2022, the court found that no northern long-eared bats have been seen on site, nor are they any known hypercula, winter roost sites for known maternity roost trees on the Kaneway property. That's in the EA. So Ms. Wanamaker has this burden to rebut that, and the district court, again, at the hearing, she complained that while 1,500 acres have been surveyed, not the entire 9,076 acres, that the district court, and this is very illuminating, stated, well, quote, well, you know, you say that, you know, at any point, Ms. Wanamaker, this case has been pending quite a while, a couple of years, and the biological opinion says 2023. You know me well enough. Had you asked me to access the property to inspect yourself, I would have granted it. Ms. Wanamaker, yes, well, the district court, you didn't do it. Ms. Wanamaker, quote, we could not go out and survey this whole 9,000 acre property. I mean, there's no way that we could have surveyed 9,000 acres, unquote, and at the end of the hearing, Judge Garville again said, Ms. Wanamaker, if you disagree with Mr. DeHart about the lack of nor the longer vats, I'll grant you access and you can do your own surveys. They never asked to do that. My point being, Your Honor, it's impractical for us to survey all 9,076 acres. As noted in the biological opinion, half of the Kanhoye property are wetlands. Some of them are deepwater, alligator-infested swamps. It'd be very, very difficult to survey the entire property. It'd be difficult for the defendant intervenors. It's difficult for the plaintiffs, and you need not take my word for it, Ms. Wanamaker. I mean, there's no way we could survey the entire 9,000 acres. Was the 1,500 acre survey considered in the ITS? No, ma'am, but it was entered into the district court record at the preliminary injunction hearing, and it was undisputed, and Judge Garville found in his order that, in fact, a nor the longer vat had never been cited at Kanhoye. So it wasn't in the administrative record, Your Honor, but it is in the district court record, if that makes sense. There's some earlier surveys that were in the administrative record, but again, Your Honor, I would also point out to some of the factual findings the district court made that, as Ms. Wanamaker... So there were earlier surveys of this property? Yes, sir, a small number, and then I'll just give you the full disclosure. You know, Ms. Wanamaker, the plaintiffs made some claims that the nor the longer vat population at Kanhoye is essential to the recovery of the species, which is inconsistent with all the evidence. So we, in preparation for our injunction hearing, surveyed an additional 1,500 acres, not a single nor the longer vat. What was the earlier surveys? What did they show? Same thing, Your Honor. Exactly, two separate engineering firms, one employed by my clients, one employed by Doltie Peltie Del Webb, not a single nor the longer vat. In addition, Your Honor, Judge Gergel made some factual findings that, again, the plaintiffs can't show. They're clearly erroneous, and it's indisputable, Your Honor, that the last sighting in Berkley County of a single nor the longer vat, what you referenced several years ago, Judge Agee, it was actually in July of 2018. It was six and a half years ago, and, you know, Judge Thacker, unlike in West Virginia, these vats are not indigenous. Throughout the history of coastal South Carolina, which is four million acres, the South Carolina Department of Natural Resources have only detected 33. You know, we're confident this particular vat, we're extraordinarily confident it's not present at Kane Hoy, but nevertheless, we assume presence, and we adopted this habitat surrogate because we do have non-endangered vats, and it will protect the non-endangered vats, and in the future, as an officer of the court, I can't say it's impossible that a nor the longer vat could never go to Kane Hoy, but if they do, we're providing conservation measures and mitigation measures that are quite onerous. For example, my clients have owned this property for 90 years. It's a working timber farm, and you know, we can't timber a single tree six and a half months of the year. One last thing I'd like to... Can I ask a question about what would happen to the project if the temporary injunction were granted? I understand the secession of, or the ability to engage in the work would be incredibly short, about a month and a half, so what difference would it make to the project itself if the temporary injunction were granted? That's a great question, Judge Berner. I was about to address it. Since we got our amended permit in July of this year, some of our client developers are in the process of building homes, and if you've got a partially completed home or a partially completed road or a sidewalk, and you enjoined it in the middle of the winter, it would be a disaster. And it would cause a lot of great middle-class jobs out there, and you're telling people right before, not that the court would, forgive me, but like if there was injunction entered, you're gonna have a lot of middle-class people that are gonna be out of work. So, I mean, the fact of the matter is we're making progress right now, and to stop it for no reason would really have disastrous consequences, not only my clients, but again, a lot of middle-class jobs, so it would have real ramifications. So it would stop the work, in addition to the work that was discussed by your colleague, of the destruction of the habitat? If you look at their request for injunction, they want to enjoin everything. Tree clearing, any development work, any site work, they want to shut it down completely. So it's not just about cutting trees. I mean, so think if, you know, you and your family, you know, had a house being built on a canoe, and it's halfway built, and an injunction's issued, that would be a disaster. I mean, it could cause real damage, and if you go back and look at the request for the injunction, they want to shut everything down. So, and as Mr. McCuller noted, as of this weekend, from December 15th to February 15th, we can't timber any trees, but the rest of the site work, home construction, road construction, I mean, all of it, Ms. Watermaker wants to stop all of it, and that's just in her motion for injunction. That's indisputable. So it would cause really terrible damage to a lot of innocent people, a lot of middle-class workers, so it really would. You know, it's not as simple as just not cutting trees. We can't cut trees until February 15th, and does that answer your question, Your Honor? Yes. Okay, and one last point about irreparable harm. You're over, so wrap it up pretty quickly. Yes, sir. Irreparable harm, just two points, Your Honor, and please, I don't mean to be disrespectful to Ms. Watermaker. I have a lot of respect for her, but, you know, her member clients, Kingsway's private property, they can't access it. They can't. We only have a handful of woodpeckers left. We translocated them. But nearby, you can go to the Francis Marion National Forest, 260,000 acres, hundreds of species. You can go to Cape Romaine Federal Wildlife Refuge, 66,000 acres, 22 miles on the South Carolina coast, completely undeveloped, pristine. My point being, Your Honor, if their members want to see wildlife in the Kaneway area, there are two other options that are much easier, and given these other options... So they have alternatives to avoid their, what they think is their irreparable harm, but your clients do not. Yes, ma'am. Yes, Your Honor, that's exactly why I couldn't say it better. And then if y'all have any, I'm happy to answer them, but otherwise... Thank you very much. Ms. Watermaker, you've got rebuttal time. Thank you, Your Honor. Just a few quick points. First, on the breadth of the injunction, I mean, the only injunction that we've asked for is one to halt the work that is authorized under these environmental permits. So that's, I mean, it's tree clearing. We're not asking to stop the construction of homes that are ongoing. There's no record in the District Court of loss of middle-class jobs at the site. That argument's never been presented to the District Court. In the District Court, the developers argued that they would be harmed by the loss of contracts. The District Court didn't even address that harm. The District Court simply said there is a public interest in health care and housing, and that the health care and housing piece of the District Court's order on the public interest prong was clearly erroneous. We had actually agreed, and this was in the record before the District Court, to exempt the hospital from any injunction that was granted. So I think with all respect to Mr. DeHart, he is overstating the injunction request we made here. We have tried to narrowly tailor it, and we had also agreed to exempt another apartment complex where the construction had already been started. What we are simply trying to do is pause irreparable environmental harm until we can get to the merits. And let me just address the survey point. There's been a lot said today about surveying the site for bats. The only survey that the service considered... Your motion for injunction on JA 104 asks to enjoin construction work. What does that mean? Your Honor, if it isn't clear, what we meant is the tree clearing authorized by the biological opinion. That's the work authorized by the... You're saying that you filed a motion for injunction that included that language, and you don't know what it means? No, I mean, I'm saying, Your Honor, that it naturally means the work authorized by the permits that we challenged. I mean, we are asking to enjoin the permit, so the work authorized under the permit, which is the tree clearing at the site. I mean, that's what the biological opinion authorizes. If I may address the survey points, this is from the developer's own consultant. The permittee recognized the... This is the developer's consultant, not the Fish and Wildlife Service. And not us. And JA what? JA 1281. Thank you. The permittee recognizes the extent of suitable habitat on-site as described above. The Fish and Wildlife Service has stated that the action does not qualify for a shortened consultation. The Fish and Wildlife Service, quote, would require the entire project area, not just clearing limits, to be acoustically surveyed in order to concur with absence. Due to the 123 acre maximum survey area, approximately 75 surveys will be necessary to cover the project area. Then the developers go on to say that this would be infeasible. And so instead they are going to assume the presence of the bat. They themselves said surveys were infeasible. They agreed to assume presence. There is no burden on the plaintiff in an endangered species case to go demonstrate the presence of a extremely endangered animal on private property. I mean, that is not how the law works. There's a consultation framework where there's a finding made of whether an action may affect a listed species, and that was made here. Presence was determined, and we entered into the Section 7 consultation, which found lethal take of bats on the property. When they find lethal take, they must have a lawful incidental take statement. It doesn't matter if there's mitigation. It doesn't matter if there's no jeopardy. They must have a lawful take statement to serve as a trigger when the impacts of the project become too much, and they don't have a lawful incidental take statement here for the same reasons they don't have one, didn't have one in Sierra Club. Let me just be as short as I can on the Sierra Club opinion. If you read the opinion carefully, for four of the five species at issue, where not necessarily because there was a hibernacula, for example for the bee, there was only one survey that had been done several years before finding a bee. The same for log perch where the court set, I mean where the service set a numeric take limit. For four of the five species, the court said you can survey, so you must survey to set an incidental take statement, an incidental take limit, and the same exact rationale applies here, and it's the same type of clearing for bats, the Indiana bat at issue in the pipeline. It was 4,000 acres of roosting habitat, not activities near hibernacula. So, Your Honor, there's no meaningful way to distinguish the Sierra Club, Sierra Club opinion from the incidental take statement issued here, the monitoring argument that everyone is raising. I would just urge the court to go back and listen to the oral argument on the Sierra Club case. That was DOJ's entire, the government's entire argument, that they could not monitor non-lethal bat take, and the court rejected it. It sent the buyout back to the agency, and the agency was able to set a numeric take limit and then monitor non-lethal take with a surrogate, and that, Your Honor, is all we're asking for here, that this buyout be lawfully authored and be able to be implemented so that there is some trigger for re-initiation if the impacts of this project become too great. Right now, there's no trigger. If they are right that there are no bats out there and the take limit is set at zero or one, there's no problem, because they'll never take a bat, they'll never enter into re-initiation. If there are lots of bats out there, and there's lethal take as the buyout predicts, there's no means right now to re-initiate. We will never re-initiate on this project until 3,900 acres of forests have been cleared. It doesn't matter if that takes one bat or 500 bats, and that, Your Honor, is unlawful, and it's unlawful for the same reasons that the ITS was unlawful in the Sierra Club case. Thank you. Thank you very much. We appreciate the arguments of all counsel. We're going to come down and greet counsel, and then we're going to take a very short recess. This honorable court will take a brief recess.
judges: G. Steven Agee, Stephanie D. Thacker, Nicole G. Berner